CASE NO. 25-1736

IN THE

# United States Court of Appeals
# for the Fourth Circuit

**ROCK SPRING PLAZA II, LLC,**

*Plaintiff-Appellee,*

v.

**INVESTORS WARRANTY OF AMERICA, LLC; ROCK SPRINGS DRIVE LLC,**

*Defendants-Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND AT GREENBELT**

---

30(C) PAGE PROOFS
<u>OPENING BRIEF OF DEFENDANTS-APPELLANTS</u>
INVESTORS WARRANTY OF AMERICA, LLC AND
ROCK SPRINGS DRIVE LLC

---

Kevin B. Getzendanner
Rebecca Allison Davis
ARNALL, GOLDEN &
 GREGORY LLP
171 17th Street, NW - Suite 2100
Atlanta, GA 30363-1031
(404) 873-8620 (PH)
(404) 873-8500 (PH)
kevin.getzendanner@agg.com
rebecca.davis@agg.com

Counsel for Appellants -
Investors Warranty of America, LLC

Sara Elizabeth Kropf
KROPF MOSELEY
 SCHMITT PLLC
1100 H Street NW - Suite 1220
Washington, DC 20005
(202) 627-6900 (PH)
sara@kmlawfirm.com

Counsel for Appellants -
Rock Springs Drive LLC

## <u>DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Defendant Investors Warranty of America, LLC makes the following disclosure:

1.     Is party/amicus a publicly held corporation or other publicly held entity?

No.

2.     Does party/amicus have any parent corporations?

Yes. Investors Warranty of America, LLC ("IWA") is an Iowa Corporation, whose member is RCC North America, LLC ("RCC"), a Delaware limited liability company. RCC's member is Transamerica Corporation, a Delaware corporation. The sole shareholder of Transamerica Corporation is the Aegon Trust, which is located in The Hague, The Netherlands. The Aegon Trust is owned by the Aegon International B.V., which is owned by Aegon N.V., both of the Hague, The Netherlands. Aegon N.V. is a publicly traded entity.

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

Yes. Investors Warranty of America, LLC ("IWA") is an Iowa Corporation, whose member is RCC North America, LLC ("RCC"), a Delaware limited liability company. RCC's member is Transamerica Corporation, a Delaware corporation. The sole shareholder of Transamerica Corporation is the Aegon Trust, which is located in The Hague, The Netherlands. The Aegon Trust is owned by the Aegon International B.V., which is owned by Aegon N.V., both of the Hague, The Netherlands. Aegon N.V. is a publicly traded entity.

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

No.

5.     Is party a trade association?

No.

i

6.    Does this case arise out of a bankruptcy proceeding?

No.

7.    Is this a criminal case in which there was an organizational victim?

No.


Dated: September 12, 2025                 */s/ Rebecca A. Davis*
                                          Rebecca A. Davis
                                          *Counsel for Investors Warranty of*
                                          *America, LLC*

## <u>DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Appellate Procedure 26.1 and Local

Rule 26.1, Defendant Rock Springs Drive, LLC makes the following disclosure:

1.    Is party/amicus a publicly held corporation or other publicly held entity?
No.

2.    Does party/amicus have any parent corporations?

Yes. Rock Springs Drive, LLC is a limited liability company, created as a joint venture with two members – Investors Warranty of America LLC and Longshore Ventures LLC.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held

corporation or other publicly held entity?

No.

4.    Is there any other publicly held corporation or other publicly held entity that

has a direct financial interest in the outcome of the litigation?

No.

5.    Is party a trade association?
No.

6.    Does this case arise out of a bankruptcy proceeding?
No.

7.    Is this a criminal case in which there was an organizational victim?
No.

Dated: September 12, 2025          /s/ *Sara E. Kropf*_____
                                                   Sara E. Kropf

                                                   *Counsel for Rock Springs Drive LLC*

iii

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF JURISDICTION......................................................3

STATEMENT OF THE ISSUES...........................................................3

STATEMENT OF CASE ........................................................................5

    A.    The Ground Lease ...............................................................5

    B.    The Estoppel Agreement ....................................................6

    C.    Original Tenant's Default and the Foreclosure....................9

    D.    The Assignment..................................................................10

    E.    Procedural History..............................................................11

SUMMARY OF ARGUMENT ..............................................................14

ARGUMENT ..........................................................................................18

    I.    THERE IS NO WRONGFUL ASSIGNMENT CLAIM AS A
        MATTER OF LAW ........................................................18

        A.    The district court erred by failing to give effect to the
            unambiguous meaning of the assignment-and-release provisions
            in the Contracts as required by Maryland's rules of contract
            construction. ..............................................................18

            1.    Maryland follows the objective theory of contract
                interpretation..................................................18

            2.    The unambiguous language of the Contracts grants IWA
                the absolute and unconditional right to assign the Ground
                Lease to RSD and to be released from all tenant
                responsibilities following the Assignment. ....................20

            3.    The district court improperly rewrote the Contracts to
                convert the "absolute right" of assignment into a
                conditional right, which requires the assignee to have the
                "independent capacity to assume and perform the tenant's
                lease obligations."........................................................22

B.    The district court erred when it used Restatement (Second) of Contracts §317 and the implied due of good faith and fair dealing to circumvent unambiguous contract language and create a triable issue. ...........................................................................24

    1.    Maryland case law and the Restatement rules of contract assignment preclude Plaza's objection to the Assignment. ......................................................................................25

    2.    The district court erred in finding that the Implied Duty of Good Faith and Fair Dealing can apply to limit the absolute rights of assignment-and-release expressly conferred upon IWA in the Contracts. ..........................29

II.    THERE WAS NO FRAUDULENT CONVEYANCE AS A MATTER OF LAW. ..........................................................................33

    A.    Because the Lease and Estoppel Agreement gave IWA the absolute right to assign the Lease to RSD, as a matter of law, the assignment cannot be a fraudulent conveyance.........................33

    B.    IWA's Assignment of the Lease to RSD is not a conveyance within the ambit of Maryland's fraudulent conveyance statute ... ...............................................................................................38

III.    THERE IS NO ALTER EGO CLAIM AS A MATTER OF LAW....40

IV.    EVEN IF PLAZA'S FRAUDULENT CONVEYANCE AND ALTER EGO CLAIMS WERE NOT SUBJECT TO DISMISSAL AS A MATTER OF LAW, THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY EXCLUDING DEFENDANTS' RELEVANT AND ADMISSIBLE EVIDENCE CONTRADICTING PLAZA'S ALLEGATIONS OF DEFENDANT'S FRAUDULENT INTENT AND EXPLAINING THE CONTEXT OF THE CONTRACTS..........................................43

V.    THE DISTRICT COURT ERRED IN MULTIPLE JURY INSTRUCTIONS. ..............................................................................51

CONCLUSION ....................................................................................54

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abatement Env't Res., Inc.*,
    102 F. App'x 272 (4th Cir. 2004) ................................................................39, 40

*Alexander v. Theatre Realty Corp.*,
    70 S.W.2d 380 (Ky. 1934) ............................................................................37

*Baltimore Line Handling Co. v. Brophy*,
    771 F. Supp. 2d 531 (D. Md. 2011) ..........................................................41, 42

*Bank of Montreal v. Signet Bank*,
    193 F.3d 818 (4th Cir. 1999) ....................................................................44, 51

*Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*,
    275 Md. 295 (1975) ....................................................................................41, 42

*Carty v. Westport Homes of N. Carolina, Inc.*,
    472 F. App'x 255 (4th Cir. 2012) ..............................................................34, 36

*Certain Underwriters at Lloyd's, London v. Sinkovich*,
    232 F.3d 200 (4th Cir. 2000) ..........................................................................47

*Connecticut Gen. Life Ins. Co. v. Feldman*,
    No. CIV.A. WMN-14-03670, 2015 WL 4064711 (D. Md. July 1,
    2015), *aff'd*, 639 F. App'x 198 (4th Cir. 2016) ................................................34

*Crawl v. Experian Information Solutions, Inc.*
    (Messitte, J.), No. CV PJM 15-97, 2016 WL 8716597 (D. Md. Jan.
    29, 2016) ..........................................................................................................26

*Dennard v. Freeport Mins. Co.*,
    297 S.E.2d 222 (Ga. 1982) ..............................................................................27

*Dixon v. Process Corp.*,
    38 Md. App. 644 (1978) ............................................................................41, 54

*Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*,
    434 Md. 37 (2013) ............................................................................................19

*Duncan Servs., Inc. v. ExxonMobil Oil Corp.*,
    722 F. Supp. 2d 640 (D. Md. 2010) .................................................................26

*Gentry v. E. W. Partners Club Mgmt. Co. Inc.*,
    816 F.3d 228 (4th Cir. 2016) .........................................................................51

*Hildreth v. Tidewater Equip. Co.*,
    378 Md. 724 (2003) .......................................................................................41

*Iceland Telecom, Ltd. v. Information Sys. & Networks*,
    268 F. Supp. 2d 585 (D. Md. 2003) ...............................................................42

*In re Investors Warranty of America, LLC*,
    23-1928 ..........................................................................................................12

*In re Investors Warranty of America, LLC*,
    24-1434 ..........................................................................................................12

*JGMCJ Corp. v. Sears, Roebuck & Co.*,
    391 F.3d 364 (1st Cir. 2004) .........................................................................27

*Julian v. Christopher*,
    320 Md. 1 (1990) ...............................................................................31, 32, 38

*Kim v. Cedar Realty Tr., Inc.*,
    116 F.4th 252 (4th Cir. 2024) .................................................................29, 30

*Kotteakos v. United States*,
    328 U.S. 750 (1946) ......................................................................................44

*Kreisler v. Goldberg*,
    478 F.3d 209 (2007) ......................................................................................43

*Le Doux v. W. Express, Inc.*,
    126 F.4th 978 (4th Cir. 2025) .......................................................................43

*Lithko Contracting, LLC v. XL Ins. Am., Inc.*,
    487 Md. 385 (2024) ......................................................................................20

*MFP Eagle Highlands, LLC v. Am. Health Network of Indiana, LLC*,
    No. 1:07-CV-0424, 2009 WL 77679 (S.D. Ind. Jan. 9, 2009) .........34, 35, 36, 37

*Middlebrook Tech, LLC v. Moore*,
  157 Md. App. 40 (2004) ...................................................................20

*Nesbit v. Gov't Employees Ins. Co.*,
  382 Md. 65 (2004) .............................................................................19

*Pac. Indem. Co. v. Interstate Fire & Cas. Co.*,
  302 Md. 383 (1985) ...........................................................................19

*Parker v. Columbia Bank*,
  91 Md. App. 346 (1992) .....................................................................29

*Polek v. J.P. Morgan Chase Bank, N.A.*,
  424 Md. 333 (2012) ...........................................................................29

*Pub. Serv. Comm'n of Md. v. Panda-Brandywine, L.P.*,
  375 Md. 185 (2003) .............................................................25, 26, 28

*Questar Builders, Inc. v. CB Flooring, LLC*,
  410 Md. 241 (2009) .....................................................................30, 31

*Qun Lin v. Cruz*,
  247 Md. App. 606 (2020 .....................................................................42

*Ramey v. Koons*,
  230 F.2d 802 (5th Cir. 1956) .......................................................27, 37

*Ramlall v. MobilePro Corp.*,
  202 Md. App. 20 (2011) .....................................................................41

*Robinson v. Equifax Info. Servs., Inc.*,
  560 F.3d 235 (4th Cir. 2009) .............................................................43

*Schultz v. Butcher*,
  24 F.3d 626 (4th Cir. 1994) .........................................................44, 51

*Shadeland Dev. Corp. v. Meek*,
  489 N.E.2d 1192 (Ind. Ct. App. 1986) ..............................................37

*Sky Angel U.S. LLC v. Discovery Communications, LLC*,
  885 F.3d 271 (4th Cir. 2018) .............................................................31

*Slice v. Carozza Props., Inc.*,
    215 Md. 357 (1958) ...................................................................19

*Snoeyenbos v. Curtis*,
    60 F.4th 723 (4th Cir. 2023) ...................................................51

*Starfish Condo. Ass'n v. Yorkridge Serv. Corp.*,
    295 Md. 693 (1983) ...................................................................42

*Tomran, Inc. v. Passano*,
    391 Md. 1 (2006) ........................................................................19

*United States v. Turner Constr. Co.*,
    946 F.3d 201 (4th Cir. 2019) ...................................................19

*Woollard v. Gallagher*,
    712 F.3d 865 (4th Cir. 2013) ..............................................18, 33

**Statutes**

28 U.S.C. § 1291 ...................................................................................3

28 U.S.C. § 1332 ...................................................................................3

Maryland's Uniform Fraudulent Conveyance Act ...................16, 38, 39, 40, 53

Md. Code Ann., Com. Law § 2-210.. ... .................................................. 53

**Other Authorities**

37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 1 (2001) .................33, 39

Black's Law Dictionary 12th ed. (2024) ...........................................28, 32

Fed. R. Civ. Pro. 50.............................................................................16

Fed. R. Civ. Pro. 56.............................................................................13

Fed. R. Civ. Pro. 63.............................................................................2

Fed. R. Evid. 702 ...............................................................................47

Local Rule 32.1 ..................................................................................39

ix

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/any ...................................................................28

Restatement (2d) of contracts ...................................................................23

Restatement (Second) of Contracts....................................... 2, 11, 12, 14, 24, 25, 26

## PRELIMINARY STATEMENT

This case addresses the validity of an assignment of a leasehold under a 99-year ground lease and an estoppel agreement for a commercial office property in Bethesda, Maryland. Plaintiff Rock Spring Plaza II, LLC ("Plaza") is the landlord. The original tenant under the ground lease obtained a $30 million loan secured by its leasehold interest (the "Loan"). Central to this dispute, the estoppel agreement Plaza entered into with the lender expressly granted the lender the right to foreclose on the leasehold in the event of a Loan default. The estoppel agreement further granted the lender the "absolute" and unconditional right to assign the Ground Lease to "any third party" without the landlord's consent, and thereafter be "automatically released" from further ground lease obligations.

In 2011, the original tenant defaulted on the Loan and the ground lease, leaving an unpaid balance of approximately $27 million owing to the lender. The Loan was acquired by Defendant Investors Warranty of America, LLC ("IWA") who, pursuant to its rights as lender, foreclosed on the Loan.

In 2017, relying on its "absolute" contractual right to assign the ground lease to "any third party" and be "automatically released from further liability thereunder following any such assignment," IWA assigned the ground lease to a Maryland limited liability company, Defendant Rock Springs Drive, LLC ("RSD"). RSD is a joint venture in which IWA holds a majority ownership interest.

1

Up to the date of that assignment, IWA never defaulted on its obligations under the ground lease. RSD, IWA's assignee, has also never defaulted. Nevertheless, in 2020, three years after the assignment, Plaza sued IWA and RSD seeking to void the assignment as a fraudulent conveyance, alleging that IWA made the assignment for the sole purpose of shielding itself from its obligation to pay ground rent, and asserting that RSD is merely the alter ego of IWA, created to perpetrate the fraudulent conveyance. It later amended the complaint to add a contract-based claim that the assignment was wrongful and invalid.

Rather than enforce the unambiguous contract language, the district court rewrote the contract language in Plaza's favor, converting the absolute right of assignment into a conditional one. As re-written by the court, an assignment is permissible, but the assignor's "automatic" release is effective only if the assignment is made to a "bona fide third party that is independently capable of assuming and performing the tenant's obligations under the Ground Lease." To reach this result, the district court relied on a hodgepodge of legal doctrines, including adequate assurance of performance, the implied duty of good faith and fair dealing, and the Restatement (Second) of Contracts. Under Maryland law, however, none of these doctrines can restrict or alter the effect of the estoppel agreement's plain language granting IWA an unconditional right of assignment. The district court erred when it denied IWA's and RSD's motions for judgment as a matter of law under Rules 56

2

and 50. The verdict and final judgment should be reversed, and judgment should be entered in IWA and RSD's favor confirming the validity of the assignment and dismissing all of Plaza's claims.

## STATEMENT OF JURISDICTION

The district court asserted subject matter jurisdiction over this matter under 28 U.S.C. § 1332 based on alleged diversity.

This Court has jurisdiction under 28 U.S.C. § 1291 because the orders under appeal are a final judgment of the district court that disposed of all parties' claims.

The district court entered final judgment on October 10, 2024, and denied Defendants' Motion for Directed Verdict or, in the Alternative, for a New Trial, and Motion to Amend Judgment on May 27, 2025. Defendants timely filed the Notice of Appeal on July 15, 2025.

## STATEMENT OF THE ISSUES

(1)    Whether the district court erred by failing to grant IWA's Motion for Summary Judgment; Motion for Directed Verdict on Plaza's Wrongful, Invalid Assignment Claim; or Motion to Amend Judgment because two unambiguous contracts explicitly granted IWA the absolute and unconditional right to assign the Ground Lease and to be released from further liability and the Assignment was therefore valid as a matter of law.

(2)     Whether the district court erred by failing to grant judgment as a matter of law in favor of Defendants on Plaza's Fraudulent Conveyance claim because IWA's valid and effective assignment of the Ground Lease negated the existence of fraud as a matter of law and because IWA did not transfer an asset out of reach of a creditor, which is required for a fraudulent conveyance under Maryland law.

(3)     Whether the district court erred by failing to grant judgment as a matter of law for Defendants on Plaza's Alter Ego claim because IWA's valid and effective assignment of the Ground Lease negates the claim that RSD was used for any fraudulent purpose.

(4)     Whether the district court committed reversible error in its instructions to the jury on the doctrines of Adequate Assurance of Performance, Implied Duty of Good Faith and Fair Dealing, and Alter Ego, where such instructions were either legally erroneous or entirely inapplicable to the circumstances of the case (or both), and where the erroneous instructions seriously prejudiced the Defendants.

(5)     Whether the district court committed reversible error by excluding evidence at trial, including all of Defendants' relevant expert testimony to counter Plaza's allegations of fraud and evidence relevant to the context and purpose of the Ground Lease and Estoppel Agreement that would have refuted Plaza's claims.

## STATEMENT OF CASE

**A.    The Ground Lease**

Plaza is a special purpose entity ("SPE") and landlord of commercial property located in a Bethesda, Maryland office park (the "Property"). (ECF1 at page 1) Property is subject to the Amended and Restated Ground Lease Indenture dated November 14, 1990 ("Ground Lease"), which was originally between Rock Spring II Limited Partnership ("Original Tenant") and Anne Camalier as landlord. (ECF13-2.) Anne Camalier signed the Ground Lease on behalf of both parties. Original Tenant and Plaza, Anne Camalier's successor as landlord, are SPEs controlled by the Camalier family. (ECF132-2, ECF127-18 at 2-3.)

A ground lease is a long-term lease of real property, under which the tenant possesses the land and owns any improvements it develops on the property for the term. (ECF132-6 at 3.) The Ground Lease created a 99-year leasehold estate (the "Leasehold Estate") and Section 7.1 of the Lease required Original Tenant to construct an office building on the property. (ECF13-2 at 3, 34.) The Ground Lease expires in November 2089, at which time the land and all improvements revert back to the landlord. (ECF196 at 12, 13.)

Section 5.2(a) of the Ground Lease provides that, without applicable conditions or restrictions,[1] the "[t]enant may assign this Lease and may mortgage its leasehold estate." (ECF13-2 at 23.) Section 14.5 expressly releases the assignor-tenant after an assignment: "Notwithstanding anything else contained in this Lease, Landlord agrees that Tenant and its successors and assigns shall be liable only for obligations accruing while it holds the leasehold estate created hereunder." (ECF13-2 at 53.)

Section 11.1 gives the tenant the right to take out a mortgage loan, using the Leasehold Estate as collateral for the loan. Section 11.2 provides that if the borrower-tenant defaults on the mortgage loan, however, then the mortgage lender may foreclose and take ownership of the Leasehold Estate. (ECF13-2 at 45-46.) As described below, Original Tenant took advantage of this provision, triggering the chain of events that led to this dispute.

**B.     The Estoppel Agreement**

Original Tenant took out a loan to fund construction of the office building on the Property. In 2006, Original Tenant refinanced the original loan by taking out a $30 million mortgage Loan from IWA's predecessor, using the Leasehold Estate as collateral. (ECF127-18 at 1.) As an express condition for making the Loan, the

---

[1] Section 5.2 references certain restrictions in favor of a prior lienholder, however that lien was released prior to the transactions at issue here, and those restrictions have no relevance here.

Lender required Plaza to execute the Ground Lessor Estoppel and Non-Disturbance Agreement ("Estoppel Agreement"). Charles Camalier, son of the original landlord, signed the Estoppel Agreement on behalf of both Plaza and Original Tenant. (ECF13-3 at 11.)

In the Estoppel Agreement, Plaza and Original Tenant "acknowledge[d] that [the Estoppel] Agreement is intended to benefit the Lender." The Estoppel Agreement modified the Ground Lease and included terms granting the Lender specific rights of assignment-and-release beyond the assignment rights already accorded to the tenant under the Ground Lease. (ECF13-3 at 7.)[2]

Section 12 defines the Lender's rights if the Original Tenant defaulted on the Loan. Upon a default, the Lender can foreclose on, and then assign, the Leasehold Estate without the landlord's consent. Section 12 imposes only one condition on the assignment, which is that the Lender must notify the landlord within ten days *after* the transaction:

> The Lender or its successors or assigns may enforce the Deed of Trust and acquire title (or any third-party purchaser may acquire title at a foreclosure sale or by deed in lieu of foreclosure) to the leasehold estate in the Premises in any lawful way and, pending foreclosure of the Deed of Trust, the Lender may take possession of and operate the Premises, or any portion thereof subject to the terms of the Lease and its Deed in

---

[2] This brief will refer to IWA as the "Lender" as it stepped into the shoes of the original lender. (ECF123-7 at 1 & ECF132-8 at 2.) Defendants have moved to include Exhibit 1, which is a chart identifying the successors and assigns of Anne Camalier, the Original Tenant, and the Lender, and Exhibit 2, which is a timeline of events.

Trust to the extent not in conflict with the Lease, perform all obligations performable by Tenant, and ***upon foreclosure of the Deed of Trust by power of sale, judicial foreclosure, or upon acquisition of the leasehold estate by a deed or other transfer in lieu of foreclosure, Lender may, without further consent of Landlord, sell and assign the leasehold estate in the Premises.  Lender shall notify Landlord in writing of such sale or assignment within ten (10) days of such sale or assignment.*** Provided any defaults by the Tenant have been cured to the extent required by the terms of the Lease, any assignee of the leasehold estate following a foreclosure of the Deed of Trust by power of sale or judicial foreclosure (or transfer by deed in lieu thereof) shall be liable to perform the obligations imposed upon Tenant by this Lease only during the period such person has ownership of said such leasehold estate.

(ECF13-3 at 5.) (Emphasis added.)

In return for the Loan, the Lender required Plaza's agreement that if Original Tenant defaulted on the Loan, Lender could exercise its remedies and dispose of the Leasehold without retaining continued liability under the Ground Lease following such disposition. To that end, Section 19 expressly gave the Lender the "absolute right" to assign the Ground Lease to "any third party" and be "automatically released" from all future Ground Lease obligations:

Except as otherwise provided in the Lease, no limitation upon or condition to any assignment of the Lease shall apply to any transfer of the lease by foreclosure, trustee's sale, sheriff's sale or an assignment in lieu thereof. ***If the Lender acquires the Tenant's interest in the Lease or the Lender acquires a new lease pursuant to any provision of the Lease, the Lender shall have the absolute right to assign the same or sublease all or any portion of the Premises to any third party. So long as such third party assumes all of the Tenant's obligation under the Lease the Lender shall be automatically released from any further liability thereunder following any such assignment except for***

8

> ***any of the Lender's obligations or liabilities under the Lease arising***
> ***during Lender's period of ownership***.

(ECF13-3 at 7.) (Emphasis added.)

## C.    Original Tenant's Default and the Foreclosure

Approximately five years after the Loan was fully funded, Charles Camalier, on behalf of Original Tenant, notified the Lender in writing that Original Tenant would not repay approximately $27 million of the $30 million Loan still owed. (ECF127-8; ECF132-14) Camalier also informed the Lender that Original Tenant planned to default on its obligations under the Ground Lease, and that if the Lender did not cure the default by paying Original Tenant's ground rent, the Ground Lease would be extinguished. (ECF132-14; ECF127-18 at 1.) Camalier, on behalf of Plaza, then sent a separate demand to the Lender to cure Original Tenant's default of the Ground Lease by paying ground rent. (ECF410-14.)

If Plaza extinguished the Ground Lease, then IWA would lose the collateral for the Loan in addition to its loss of the  $27 million unpaid Loan debt. To avoid this outcome, IWA foreclosed on the Leasehold Estate in 2012. (ECF509-3 at 8.)

This chain of events, starting with the Camalier family's refusal to fund the Original Tenant to pay back the $27 million Loan, triggered IWA's broad assignment-and-release rights in the Ground Lease and Estoppel Agreement (together, the "Contracts").

**D.     The Assignment**

For about five years after the foreclosure, IWA tried to sell or sublease the Leasehold Estate to mitigate its $27 million Loan loss. Despite its efforts, IWA could not find subtenants or a purchaser. (ECF132-10 at Ex. 2.)

In 2017, IWA entered into a joint venture with nationally recognized distressed real estate restructuring experts to further explore a possible disposition of the Leasehold. IWA and the third party, Longshore Ventures LLC, formed RSD, a Maryland limited liability company to hold, manage and (hopefully) make the Property profitable. (ECF132-10 at Ex. 2.)  IWA assigned the Leasehold Estate to RSD on August 31, 2017 (the "Assignment"), and concurrent with the Assignment, RSD agreed in writing to assume all obligations under the Ground Lease. (ECF411-4.) IWA timely sent Plaza a written notice within 10 days of the Assignment, as required by Section 12 of the Estoppel Agreement.  (ECF411-7.)

Since 2017, RSD has fully performed its Ground Lease obligations; by the time of the 2024 trial, RSD had paid Plaza approximately $11 million in ground rent and $6 million in insurance, taxes, and maintenance expenses. (ECF411-10 at 1-2.) After accepting RSD's rent payments for nearly three years, Plaza sued RSD in June 2020 seeking to nullify the Assignment.  (ECF1 at 12.)

E.    **Procedural History**

Plaza's initial complaint asserted counts for (i) Declaratory Judgment that Assignment Was a Fraudulent Conveyance; (ii) Set Aside the Fraudulent Conveyance; (iii) Pierce the Corporate Veil to Enter Judgment that Landlord May Collect Rent from Tenant for the Remainder of the Lease;[3] (iv) Judgment That Tenant is Alter Ego of Assignee. (ECF1.) The Complaint did not rely on any provisions of the Contracts and did not attach the Contracts as exhibits. IWA and RSD (collectively, "Defendants") filed counterclaims seeking a declaration from the district court that the Assignment was valid based on the Contracts. (ECF32, ECF33, ECF42, ECF44.)

The parties briefed summary judgment in two phases. The district court ordered the first phase *sua sponte*, stating that it needed to determine what information a landlord was entitled to receive from a tenant to evaluate a proposed assignee's ability to perform the tenant's obligations, and then potentially block the assignment. (ECF117.) The district court's ruling in the first phase of summary judgment created the "Basic Information Standard," holding that under Maryland law "Defendants have a duty to disclose basic information regarding RSD, consistent with the Restatement (Second) of Contracts, §317 … so that Plaintiff may obtain adequate assurance that RSD is able to perform IWA's obligations under the Ground

---

[3] Plaza ultimately dismissed this count. (ECF606 at 57:1-18.)

11

Lease and Estoppel Agreements." (ECF151 at 20.) Having concluded that §317 restricted the tenant's contractual right of assignment, the district court then directed Plaza to file a contract-based claim to challenge the Assignment. (ECF185-1 at 27:22-23.) Plaza complied by filing a Second Amended Complaint including a new Count I for "Wrongful, Invalid Assignment" against IWA alone. (ECF196.)

During discovery, this Court twice granted petitions for mandamus filed by IWA in connection with certain disputes. *See In re Investors Warranty of America, LLC*, 23-1928 and *In re Investors Warranty of America, LLC*, 24-1434.

During a second round of summary judgment motions after discovery, Defendants filed a motion for summary judgment requesting dismissal of Plaza's fraudulent conveyance claim, and IWA separately sought summary judgment to dismiss the Wrongful, Invalid Assignment and Alter Ego claims. (ECF409, ECF410, ECF411.) The district court denied Defendants' summary judgment motions. (ECF486.)

The district court conducted a jury trial from August 26, 2024, to September 10, 2024. (ECF592.) The jury found for Plaza on all claims. (ECF581.) The district court entered a Final Judgment on October 10, 2024, that entered the verdict and also declared a new meaning for the Contracts. (ECF592.) Defendants filed post-trial motions for directed verdict and alternatively, new trial, and while those motions were pending, the trial judge (Messitte, J) passed away. The case was

reassigned to a new district court judge (Rubin, J). On May 27, 2025, upon review of the motions pursuant to Rule 63, the new judge denied the post-judgment motions, though she did so by applying a presumption of correctness to Judge Messitte's prior rulings. (ECF613.)

This appeal followed. The orders on appeal are (1) the order denying IWA's Motion for Summary Judgment on Plaza's Wrongful, Invalid Assignment Claim (ECF486);  (2) the order denying Defendants' Motion for Summary Judgment on the Fraudulent Conveyance and Alter Ego Claim (ECF486); (3) the order granting Plaza's Motion in Limine and trial rulings to exclude evidence at trial relating to the Loan history and foreclosure (ECF529); (4) the order granting Plaza's Motion in Limine to exclude Douglas Bregman at trial (ECF529); (5) the order granting Plaza's Motion in Limine to exclude Ian Ratner at trial (ECF592); (6) the Final Judgment (ECF613); (7) the order denying Defendants' Motion for Directed Verdict and Motion for a New Trial; and (8) Motion to Alter or Amend the Final Judgment (ECF613).

# SUMMARY OF ARGUMENT

The express and unconditional assignment-and-release rights accorded to IWA under the Contracts authorized IWA's Assignment of the Ground Lease to RSD. IWA is therefore entitled to judgment as a matter of law on Plaza's Wrongful Assignment claim. The district court erred by failing to enforce the assignment-and-release provisions of the Contracts as written, and by instead rewriting the Contracts to convert the *absolute* right of assignment to "any third party" and be "automatically released" thereafter into a *conditional* right. In its Final Judgment the court declared that no assignment can be valid, and no release of the assignor can be effective, unless the assignee is a "bona fide" third party "independently capable of assuming and performing the tenant's obligations under the Ground Lease."

The district court's reformation of the assignment provisions in favor of the landlord flouts Maryland's long-settled rules of contract construction and creates out of thin air new rights and benefits in favor of the landlord that were never bargained-for or agreed to and are nowhere found in the language of the Contracts. Maryland law supplies no justification to rewrite the Contracts to benefit Plaza, particularly where the changes directly contradict the absolute and unconditional right of assignment granted by Plaza in return for the $30 million Loan.

The district court derived these manufactured contract terms from its erroneous application of two legal doctrines: §317 of the Restatement (Second) of

Contracts and the implied duty of good faith and fair dealing. Neither doctrine can properly be applied to either restrict or rewrite IWA's explicit rights of assignment-and-release in the Contracts, or to condition the right of assignment based upon any qualification of the assignee, including its independent financial capabilities.

The district court improperly relied on Restatement §317(2)(a), which states the general rule that contracts are presumptively assignable unless the substitution of an assignee may materially impair a party's chance of obtaining return performance. Yet, the district court ignored both Maryland law and Restatement §323(1), which make clear that the contract language granting an unconditional right of assignment supersedes §317(2)(a)'s exception to the presumption of assignability.

The district court similarly erred in its reliance on the implied duty of good faith and fair dealing to impose restrictions on IWA's contractual assignment rights. The court ignored settled law holding that the implied duty cannot apply to alter or add to the terms of the parties' contracts. And the court erred in determining that the implied duty creates a triable issue as to the validity of IWA's Assignment here. Under Maryland law, a triable issue arises under the implied duty only where a contract term is ambiguous as to what benefits a party may reasonably expect. Where, as here, the contract terms unambiguously refute any wishful expectation Plaza might *claim* as to the ability of RSD (or any other assignee) to perform for the remaining 60-plus years of the term of the Ground Lease, the implied duty cannot

serve as a basis to convert the absolute right of assignment to the conditional right manufactured by the district court.

IWA is thus entitled to judgment as a matter of law on Plaza's claim of Wrongful, Invalid Assignment.

Because IWA's assignment of the Ground Lease to RSD was consistent with its rights under the Contracts, the Assignment cannot constitute a fraudulent conveyance under Maryland's Uniform Fraudulent Conveyance Act (MUFCA) as a matter of law. The MUFCA affords a remedy to creditors where a debtor transfers assets to place them beyond the reach of the creditor. IWA conveyed no assets beyond Plaza's reach. The Ground Lease remained entirely within Plaza's reach after the Assignment because Plaza retained all contractual rights and remedies in it. MUFCA does not apply, and has never been applied, to negate an express, bargained-for, contractual right of assignment-and-release.

IWA and RSD are likewise entitled to judgment as a matter of law on Plaza's Alter Ego claim since that claim requires proof that RSD was used to perpetrate a fraud upon Plaza. Here, there was no wrongful assignment, and thus no fraudulent conveyance, as a matter of law.

The district court thus erred in denying Defendants' Rule 56 and post-trial motions as to each of Plaza's claims.

16

Finally, even if it were not error to submit Plaza's claims to the jury, the district court committed multiple reversible errors at trial that materially prejudiced the Defendants and entitle them to a new trial. The court improperly excluded a range of relevant and admissible evidence offered by Defendants to rebut Plaza's endlessly repeated assertions to the jury that RSD was a "sham" created by IWA to "stiff the landlord" out of ground rent. The excluded evidence included virtually all the testimony of Defendants' two highly experienced expert witnesses, who would have explained to the jury that the characteristics Plaza pointed to as evidence that RSD was a "sham" entity are in fact usual and customary features of entities to hold real property assets. Worse still, the court barred Defendants from introducing evidence that Plaza itself and its affiliated entities possessed the exact same characteristics that they were using to impute fraud to IWA and RSD.

Further, the district court committed reversible error and seriously prejudiced Defendants in its instructions on the doctrines of Adequate Assurance of Performance, Implied Duty of Good Faith and Fair Dealing, and Alter Ego, because its instructions were legally erroneous and inapplicable to the case.

In sum, the district court's erroneous exclusion of Defendant's evidence and erroneous jury instructions deprived Defendants of a fair trial.

## ARGUMENT

## I. THERE IS NO WRONGFUL ASSIGNMENT CLAIM AS A MATTER OF LAW

From the beginning of the case to the final judgment, the district court adopted a plainly erroneous construction of the assignment provisions that turns the *absolute right of assignment* into a *conditional right* – one that is dependent on the assignee's ability to satisfy the Landlord, and potentially a court, that it is "capable of performing" (i.e., paying rent) for the remaining 65 years of the Lease term. This erroneous interpretation of the parties' contracts was wrong as a matter of law. Under the plain terms of the Contracts as written, IWA's assignment of the Lease was clearly permitted, and IWA is entitled to judgment as a matter of law on Plaza's Wrongful, Invalid Assignment claim. The district court therefore erred in denying IWA's motions for summary judgment and directed verdict as to this claim. This issue is reviewable *de novo*. *See Woollard v. Gallagher*, 712 F.3d 865, 873 (4th Cir. 2013) (standard of review for motion for summary judgment).

## A. The district court erred by failing to give effect to the unambiguous meaning of the assignment-and-release provisions in the Contracts as required by Maryland's rules of contract construction.

### 1. Maryland follows the objective theory of contract interpretation.

Maryland courts "apply the law of objective contract interpretation, which provides that '[t]he written language embodying the terms of an agreement [that] will govern the rights and liabilities of the parties, irrespective of the intent of the

parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding.'" *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51 (2013) (quoting *Slice v. Carozza Props., Inc*., 215 Md. 357, 358 (1958)); *see also Slice*, 215 Md. at 368 ("the written language embodying the terms of an agreement [that] will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract.").

No Maryland precedent grants authority to a court to disregard the terms of parties' bargained-for contractual terms. Rather, Maryland law recognizes freedom of contract, and "[a]s a general rule, parties are free to contract as they wish." *Nesbit v. Gov't Employees Ins. Co*., 382 Md. 65, 76 (2004) (quoting *Van Horn v. Atlantic Mutual Insurance Company,* 334 Md. 669, 695 (1994) (internal quotations omitted)). Indeed, "[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions." *Tomran, Inc. v. Passano*, 391 Md. 1, 14 (2006); *see also United States v. Turner Constr. Co*., 946 F.3d 201, 204 (4th Cir. 2019) (holding that "[o]ne of our country's bedrock principles is the freedom of individuals and entities to enter into contracts and rely that their terms will be enforced."). A contract "is measured by its terms unless a statute, a regulation, or public policy is violated thereby." *Pac. Indem. Co. v. Interstate Fire & Cas. Co*., 302 Md. 383, 388 (1985).

The Ground Lease and Estoppel Agreements are contracts, and as such, the district court was obliged to enforce their plain terms as written. *See Middlebrook Tech, LLC v. Moore*, 157 Md. App. 40, 66 (2004). The Maryland Supreme Court has declared it is a "fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Lithko Contracting, LLC v. XL Ins. Am., Inc*., 487 Md. 385, 404 (2024). That is exactly what the district court did and its judgment should be reversed.

> **2. The unambiguous language of the Contracts grants IWA the absolute and unconditional right to assign the Ground Lease to RSD and to be released from all tenant responsibilities following the Assignment.**

Section 19 of the Estoppel Agreement expressly granted IWA, as the foreclosing Lender, the "absolute" right to assign all or a portion of its interest in the Ground Lease to "any third party." (ECF13-3 at 19.) Plaza further agreed that, "so long as such third party assumes all of the Tenant's obligations under the Lease the Lender shall be automatically released from any further liability thereunder following such assignment." (ECF13-3 at 19.) As was true of the Ground Lease, the Estoppel Agreement did not give Plaza any right to approve of an assignment nor did it impose conditions or criteria on any assignee—not as to ownership, amount or source of capitalization, or any other prerequisite qualification.

Had the district court followed Maryland law and applied the unambiguous assignment-and-release provisions of the Contracts, it would have necessarily concluded that the Assignment was authorized and effective according to the Contracts' terms. First, IWA provided the required notice to Plaza on the day of the Assignment, identifying RSD as the assignee and new tenant. (ECF411-7). Second, RSD is a "third party" under the Estoppel Agreement because it is a separate limited liability company formed under Maryland law, (ECF411-37), and it was not a party to the Ground Lease or Estoppel Agreement. Third, RSD assumed all obligations of the Ground Lease in writing (ECF411-4). and confirmed by the fact that it performed all obligations (paying rent, insurance, taxes, and maintenance) of the Ground Lease since 2017 (ECF411-10 at 1 & 2).

Consequently, because the plain terms of the Contracts make clear that IWA had the right to assign the Ground Lease to RSD and be automatically released from further liability to Plaza, IWA was entitled to summary judgment on the Wrongful, Invalid Assignment Claim as a matter of law, and the district court erred by denying it.

**3.** **The district court improperly rewrote the Contracts to convert the "absolute right" of assignment into a conditional right, which requires the assignee to have the "independent capacity to assume and perform the tenant's lease obligations."**

As a matter of contract construction, and for the reasons already stated, there is no basis to construe IWA's assignment right as conditioned on its assignee's financial wherewithal or other ability to perform the tenant's lease obligations. Such conditions could have been stated in the contract, but were not, and it is improper for the court to retroactively add them. Yet the court did exactly that by construing the assignment provisions to convert the *absolute* right of assignment into a *conditional* right that is now dependent on a vague and standardless requirement that the assignee has the "independent capacity to assume and perform the tenant's lease obligations."

The district court's erroneous construction of the Contracts infected the proceedings below with error from beginning to end. The Court first adopted its erroneous contract construction in Basic Information Standard. (ECF151.) There, the court ruled that Plaza had the right under the Contracts to obtain information about RSD sufficient to "determine whether RSD has the ability to satisfy IWA's ongoing obligations under the Ground Lease" (ECF152 at 17.) Without ever pointing to language in the Contracts that required IWA to supply such information, the court thus implicitly construed the assignment right to be dependent upon the assignee's

ability to perform. In reaching this conclusion, the district court declared: "[t]his, as the Court sees it, presents a pure unambiguous legal question for the Court to decide, not an ambiguous clause in the contract deferrable for resolution to a trier of fact." (ECF152 at 10.) The district court was correct that the construction of the unambiguous contract was a question of law for the court, but the district court was dead wrong in the construction it adopted.

The court continued its erroneous contract construction in its subsequent denial of IWA's summary judgment motion on the Wrongful, Invalid Assignment Claim, (ECF 466 at 143-151.)  In that ruling, notwithstanding the previous ruling declaring the meaning of Contracts to be a "pure unambiguous legal question for the court to decide," the court inexplicably found that there existed a *jury issue* as to the correct construction of the contracts: "These are the issues, then that the Court sees as being presented to the jury. … The intention of the parties with respect to the scope of the assignment rights in both the ground lease and the estoppel agreement; that is, *whether at the time of drafting and executing the contracts the parties intended to provide an absolute right of assignment to which Plaza could not later object*, notwithstanding the limitations as expressed in 317 of the restatement (2d) of contracts." (ECF466 at 151:4-11.) (emphasis added).

It was clear error to submit the contract construction issue to the jury. Construction of an unambiguous contract term is a pure question of law for the court

to decide, as the court did – albeit it wrongly – in the order creating the Basic Information Standard. And here the absolute right of assignment is stated in the contract in plainly unambiguous language, thus warranting summary judgment for IWA and dismissal of Plaza's Wrongful Invalid Assignment Claim.

The district court perpetuated its error in paragraphs 6, 7 and 8 of its Final Judgment when declaring its construction of the Contracts' assignment-and-release provisions. There the court declared that no assignment can be valid, and no release of the assignor can be effective, unless the assignee is a "bona fide" third party "independently capable of assuming and performing the tenant's obligations under the Ground Lease." (ECF592 at 2.) This untenable interpretation of the contracts is clearly incorrect and warrants reversal of the judgment.

The district court thus plainly erred in construing the assignment right in the Contracts as a conditional right rather than an absolute right. The court further erred to the extent it found that IWA's free assignment right can be limited by Restatement §317 or by the implied duty of good faith and fair dealing, as discussed below.

**B.    The district court erred when it used Restatement (Second) of Contracts §317 and the implied due of good faith and fair dealing to circumvent unambiguous contract language and create a triable issue.**

The district court employed Restatement §317 and the implied duty of good faith and fair dealing to erroneously submit the construction of the contract to the jury where no triable issue existed. (ECF466 at 144:10-16.) (question to be decided

by the jury is whether "RSD and IWA have the absolute right to assign, notwithstanding §317 of the restatement (2d) of contracts?"); (ECF466 at 144:13-16.) ("I don't think there is a renunciation of the implied covenant of good faith and fair dealing. It still remains in the case.").

Properly applied, however, neither of these doctrines can apply here to restrict the right of assignment or create a triable issue as to IWA's reasons for assigning the leasehold, or as to RSD's ability to perform.

### 1.    Maryland case law and the Restatement rules of contract assignment preclude Plaza's objection to the Assignment.

In Maryland, the basic rules governing the assignment of contract rights and delegation of contract duties "are well-stated in the Restatement (Second) of Contracts §§ 317-323 (1981)." *Pub. Serv. Comm'n of Md. v. Panda-Brandywine, L.P.*, 375 Md. 185, 197 (2003) ("*Panda*"). Read together, these sections underscore the well-settled rule that express contract language controls the issues of assignability and release upon assignment. *See*, *e.g.*, §317(2)(c) (contract right are assignable unless "precluded by contract"); *id*. §318(1) (performance may be delegated unless contrary to terms of the promise); *id*. §318(2) (personal performance not delegable "unless otherwise agreed"); *id*. §318(3) ("delegation of performance" does not discharge duty of the delegating obligor "unless the oblige agrees otherwise"); *id*. §323(1) ("A term of a contract manifesting an obligor's assent to the future assignment of a right or an obligee's assent to the future

25

delegation of the performance of a duty or condition is effective despite any subsequent objection.").

The district court relied on §317(2)(c) to submit the question to the jury whether the Assignment increased Plaza's risk of nonpayment under the Ground Lease. (ECF466 at 144:13-16). Section 317 first recognizes the default rule that contract rights are generally assignable; but it formulates an exception to assignability if "the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him." Restatement §317(2)(a).

But §317 does not operate to overcome express contract provisions permitting assignment. *See Panda*, 375 Md. at 198-99 (addressing provision that prohibited assignment and declaring the "general statement" in §317 as to when "rights may be assigned" is always "subject to any valid contractual provision" defining assignment rights); *Duncan Servs., Inc. v. ExxonMobil Oil Corp*., 722 F. Supp. 2d 640, 646-48 (D. Md. 2010) (finding "the clear agreement of the parties to make the contract freely assignable controls, and no inquiry into the potential increase in burdens prompted by the assignment is necessary" and later objections do not "invalidate [a contract's] free assignment provision"); *Crawl v. Experian Information Solutions, Inc.* (Messitte, J.), No. CV PJM 15-97, 2016 WL 8716597 at *5 (D. Md. Jan. 29, 2016) (§323

overrides an objection to an assignment of a contract where the contract terms expressly authorized future assignment) (applying Illinois law); *accord Dennard v. Freeport Mins. Co*., 297 S.E.2d 222, 226 (Ga. 1982) (under Section 323 plaintiff cannot object to lease assignment on ground that delegatee's performance would materially vary contract because "[l]ooking at this lease contract as a whole, we believe there was clear assent to the assignability and delegability of all the contract terms. The language of the contract clearly contemplates the free assignment and delegation of all rights and duties under the contract."); *JGMCJ Corp. v. Sears, Roebuck & Co.*, 391 F.3d 364, 368 (1st Cir. 2004) (rejecting plaintiff's contention that tenant was obligated to pay rent after assignment where lease explicitly limited tenant's obligations after assignment); *Ramey v. Koons*, 230 F.2d 802, 803-06 (5th Cir. 1956) (rejecting plaintiff's argument that lessee could only assign lease to "a responsible corporation with substantial assets" and not to a "straw" or insolvent entity where lease permitted free assignment and assumption of obligations and "released [tenant] from all obligations hereunder" upon assignment).

Moreover, even if §317(2)(a) alone could raise a triable issue relative to the effect of an assignment, §323(1) makes clear that the parties' express agreement in their contract to allow assignment overcomes the §317(2)(a) exception: "A term of a contract manifesting" a party's "assent to the future assignment of a right" or to "the future delegation of the performance of a duty or condition is effective despite

27

any subsequent objection" by that party. To underscore the point, the ALI's comment (a) to §323 makes clear that a contractual assent "may operate to preclude objection based on a change in his duty, burden or risk or in his chance of obtaining return performance"—the specific exception created in §317(2)(a). Although *Panda* also cites §323, 375 Md. at 197, the district court refused to apply §323 at the summary judgment stage.

In return for a $30 million loan, Plaza agreed the Lender could in the future assign the Ground Lease to "any third party." Those words are not ambiguous. "Any" means "one or some indiscriminately of whatever kind." *Any*, https://www.merriam-webster.com/dictionary/any (9/10/25); "third party" means "[s]omeone other than the principal parties in a matter; someone who is not a party to a lawsuit, agreement, or other transaction." *Third Party*, Black's Law Dictionary (12th ed. 2024). Because the Contracts expressly grant IWA the "absolute right" to assign, §323 and relevant case law require that the Contracts' assignment-and-release provisions apply despite Plaza's subsequent objection.

Thus, as a matter of law, §317(2)(a)'s exception cannot overrule the express assignment right granted to IWA in the Contracts, and the district court erred in submitting this issue to the jury.

**2.    The district court erred in finding that the Implied Duty of Good Faith and Fair Dealing can apply to limit the absolute rights of assignment-and-release expressly conferred upon IWA in the Contracts.**

The district court likewise erred when it found that the implied duty of good faith and fair dealing created a triable issue of fact. Although Maryland law implies a duty of good faith and fair dealing in all contracts, its reach is extremely limited. *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362 (2012). As this Court recently summarized, "the implied duty of good faith and fair dealing ensures that one party to a contract does not inhibit the other from performing its obligations, but it does not guarantee any new rights or obligations that do not already exist in the contract." *Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252, 265–66 (4th Cir. 2024); *see also Parker v. Columbia Bank*, 91 Md. App. 346, 365-66 (1992).

In *Kim*, the plaintiffs claimed that the defendant (Cedar) had "exercise[d] [its] discretion in bad faith and deliberately structure[d]" certain transactions "with the intent of injuring" the plaintiffs. 116 F. 4th at 265 (alterations in original). Based on the contracts, the Court concluded that "Plaintiffs cannot use the implied duty of good faith and fair dealing to shoehorn in rights to be represented in transaction negotiations, to be treated equally as common shareholders, to have certain financial assurances, or any other desirable outcome. They got exactly what they agreed to receive." *Id*. at 266 ("We won't belabor the point. Plaintiffs don't allege that Cedar

did anything to impede Plaintiffs' performance under the contract, so the Complaint does not allege that Cedar breached the implied duty of good faith and fair dealing.").

As in *Kim*, Plaza did not claim that IWA's Assignment did anything to impede Plaza's performance under the Ground Lease and therefore the assignment does not violate IWA's duty of good faith and fair dealing as a matter of law. Plaza cannot use the implied duty to "shoehorn in . . certain financial assurances" for a future assignee. *Id*.

*Kim* recognized in a footnote that Maryland law recognizes a different "flavor" of the implied duty, which applies when the party exercises a discretionary right; under this "flavor," the implied duty means that party may not to act to frustrate the other side's ability to receive contractual benefits. *Id*. at 266 n.15.

But Maryland law makes clear that this "flavor" of the implied duty extends no further than to secure a party's reasonable and justifiable expectations as defined by the specific terms of the contract language. Where the contract clearly marks the limits of the contractual benefits a party may expect, the implied duty cannot expand upon them. In *Questar Builders, Inc. v. CB Flooring, LLC*, 410 Md. 241, 282 (2009), the Maryland Court of Appeals explained that where a party has contractual discretion that is not tied to "personal taste," then an "objective standard of what constitutes good faith and fair dealing applies." The implied duty "requires a party exercising discretion to do so *in accordance with the 'reasonable expectations' of*

*the other party*," which "*depend[] on the language of the contract*." *Id*. (emphasis supplied); *see also Sky Angel U.S. LLC v. Discovery Communications*, *LLC*, 885 F.3d 271, 280 (4th Cir. 2018) ("To prove that Discovery breached the implied covenant of good faith and fair dealing, Sky Angel had to show that it was deprived of its '*reasonable expectations' under the contract.*") (emphasis supplied) (quoting *Questar*, 410 Md. at 282-83).

*Questar* relied on *Julian v. Christopher*, 320 Md. 1 (1990), which directly addresses assignments of leases. In *Julian¸* the Maryland Court of Appeals addressed "silent consent" clauses that specify a landlord's right to consent to assignments but identify no standard for the exercise of that discretion. The *Julian* Court recognized that although "[r]estraints on alienation are permitted in leases," they "are looked upon with disfavor and are strictly construed." *Id*. at 9. Thus, "if the lease does not spell out any standard for withholding consent, then the implied covenant of good faith and fair dealing should imply a reasonableness standard." *Id*.. But where a "freely negotiated provision of the lease clearly spell[s] out" the "inten[t] to limit the right to assign or sublease," then the court must enforce this intent as written and the implied duty does not apply to insert a "reasonableness" or any other standard. *Id*. at 11-12.

The first question for this Court, then, is whether the Contracts "spell out" a standard. They do. The right to assign is "absolute," assignment can be made to "any

third party," and the release of the assignor is "automatic." The terms of the Contracts supply a clear standard governing IWA's discretion to assign, and by design, they do so in the broadest terms possible. *See* Absolute definition, Black's Law Dictionary 12th ed. (2024) ("Absolute" means "free from restriction, qualification, or condition.").

The parties freely negotiated for this standard, and under *Julian*, the implied duty does not authorize the insertion of a "reasonableness" or other limitations on IWA's assignment-and-release rights.

The second question for the Court is whether the Contracts' language gives Plaza a reasonable expectation that a future assignee must be, in the district court's words, "independently capable of assuming and performing the tenant's obligations under the Ground Lease" for the 72 years remaining on the Ground Lease. (ECF592 at 2.) The answer is plainly no. Nothing in the Contracts' language justifies such an expectation. On the contrary, the Contract language affirmatively negates any such expectation.

If Plaza wished to avoid the risk that a future assignee might be unable to perform the tenant's obligations, then it could have required that Plaza consent to future assignments or that future assignees have certain financial wherewithal. It did not do so. Instead, Plaza expressly granted the "absolute right" to assign and agreed

to release IWA upon assignment of the Ground Lease. The district court was obliged to enforce the Contracts as written.

Under the plain terms of the Contracts, Plaza could reasonably expect nothing more as to a future assignee's ability to perform than the opportunity to exercise the full range of its contractual remedies in the event of a default by such assignee. Based on the language of the Contracts, then, the Assignment did not contravene any expectations Plaza could justifiably assert. As a result, the district court was wrong to deny judgment as a matter of law to IWA on the Wrongful Invalid Assignment claim based on the implied duty. This Court should grant IWA judgment as a matter of law.

## II.   THERE WAS NO FRAUDULENT CONVEYANCE AS A MATTER OF LAW.

The district court's denial of Defendants' motions for summary judgment and directed verdict on Plaza's fraudulent conveyance claim is reviewed *de novo. See Woollard*, 712 F.3d at 873.

### A.   Because the Lease and Estoppel Agreement gave IWA the absolute right to assign the Lease to RSD, as a matter of law, the assignment cannot be a fraudulent conveyance.

As demonstrated in Section I above, the Contracts permitted IWA's assignment of the Ground Lease to RSD. Because IWA acted entirely within its contractual rights in assigning the Lease, the assignment cannot be a fraudulent conveyance as a matter of law.

33

A party that complies with its contract cannot be held liable for other claims arising from that conduct, such as breach of fiduciary duty. *See Carty v. Westport Homes of N. Carolina, Inc.*, 472 F. App'x 255, 259 (4th Cir. 2012) ("Here again, the Individual Defendants' actions fully comport with the 2004 contracts, which expressly allowed for involuntary share transfers, i.e., ousting owners from their interests. This is what happened to Carty. . . . . The Individual Defendants' forcing Carty from his ownership interest therefore cannot serve as the basis for a breach of fiduciary duty claim."); *Connecticut Gen. Life Ins. Co. v. Feldman*, No. CIV.A. WMN-14-03670, 2015 WL 4064711, at *6 (D. Md. July 1, 2015) ("Because CGLIC complied with the terms of the Annuity, Mr. Feldman's counterclaims for breach of contract and breach of fiduciary duty will be dismissed."), *aff'd*, 639 F. App'x 198 (4th Cir. 2016).

In reaching its holding in *Carty*, this Court expressly relied on an Indiana district court decision for the proposition that where a party "was completely within its contractual rights to [engage in the disputed transaction], … it was not violating other legal duties in doing so." *Carty*, 472 F. App'x at 259 (quoting *MFP Eagle Highlands, LLC v. Am. Health Network of Indiana, LLC*, No. 1:07-CV-0424, 2009 WL 77679 (S.D. Ind. Jan. 9, 2009) (alterations in original)).

*MFP Eagle* is on all fours with this case. There, the landlord claimed that its tenant's assignment of its long-term lease in an underperforming medical office

34

building was a fraudulent transfer. 2009 WL 77679 at *1. The lease granted the physician group tenant AHN the "absolute right" to assign the lease to the two AHN physicians who practiced in the leased premises, or to any business association they might form, and provided that AHN would be released from further liability upon assignment. *Id.* at *2, 6, 11. Within three years of the commencement of the lease, the two physicians left AHN, and AHN assigned the lease to LALR, an LLC formed by the two departing physicians. *Id*. at *3. LALR was formed on the day of the assignment, was capitalized with $25,000, and held the lease as its only asset. *Id.* *4. At that point there was approximately $2,000,000 in rent due over the remaining term of the lease. *Id*. at *9. One year later, LALR defaulted and vacated the office. *Id*. at *4. The landlord sued AHN and LALR, claiming the assignment of the lease was a fraudulent transfer, and sued the two physician owners of LALR on a veil piercing theory, claiming that LALR was a sham entity. *Id*. at *1.

Addressing landlord's claims, the court stated: "[t]he best starting point is to consider whether AHN had the right to assign the lease to LALR." *Id*. at *4. The unambiguous language of the lease "allows such an assignment, regardless of the capitalization or resources of the assignee." *Id*. The tenant's "absolute right to transfer the lease" to the assignee meant that "as a matter of law . . . [the plaintiff's] claims of fraudulent transfer . . . must therefore be dismissed." *Id*. at *6. The tenant "was completely within its contractual rights to transfer the lease" and "was not

35

violating other legal duties in doing so." *Id*. Particularly relevant here, the court explained that the contract created "no specific duty to assign the lease to a viable company" because the question of "[h]ow and to whom a leasehold may be assigned is a matter for contract law to be decided by the landlord and tenant each bargaining in his own interest.'" *Id.*

The *MFP Eagle* court dismissed the landlord's veil piercing claims based on "promot[ing] fraud or injustice" against LALR's physician-owners even in light of its limited capitalization and even though the owners created it to shield themselves against personal liability. *Id*. at *10. It also rejected the landlord's argument—the same argument made by Plaza here—that the entity was undercapitalized because it did not have "sufficient capital to assure payment of $2,000,000 in remaining long-term rent obligations." *Id*. According to the court, the landlord was "arguing in effect that it was entitled to have personal guarantees of the lease obligation." *Id*. But "if MFP or its predecessors wanted personal guarantees of the long-term obligations, then they should have bargained for them. They did not." *Id*.

Defendants are entitled to judgment as a matter of law on Plaza's fraudulent conveyance and alter ego claims for the same reasons stated in the *MFP Eagle* decision and supported by this Court's holding in *Carty*: when a party's conduct is "completely within its contractual rights," the party "was not violating other legal duties" in undertaking that conduct. 472 F. App'x at 259 (quoting *MFP Eagle*). Plaza

"could have bargained for" IWA to guarantee the performance of its assignee RSD, or to limit IWA's assignment rights in other ways, but it did not. *MFP Eagle*, 2009 WL 77679 at *10. Plaza cannot use a fraudulent conveyance claim to remediate that failure now.

*MFP Eagle* is not alone in upholding free assignment-and-release rights in a lease where the lease expressly confers an unconditional right of assignment and a release of tenant upon assignment without regard to an assignee tenant's actual or alleged inability to perform. *See, e.g.*, *Shadeland Dev. Corp. v. Meek*, 489 N.E.2d 1192, 1197, 1201 (Ind. Ct. App. 1986) (involving long term ground lease giving tenant "free right of assignment" that became effective after tenant erected motel on leased premises; court found assignment valid as a matter of law even though assignee tenant was alleged to be insolvent at time of assignment and defaulted approximately 18 months after assignment with 40 years remaining on the term of the lease; court found that landlord was entitled only to bargained-for "security of the buildings in the event of a non-performance by an assignee"); *Alexander v. Theatre Realty Corp.*, 70 S.W.2d 380 (Ky. 1934) (holding that plain language of lease released the original tenant from future rent liability even though he assigned the lease to an insolvent company and holding that "it could hardly be regarded as a fraud for the [tenant] to do a thing authorized by the lease for a purpose authorized by the lease."); *Ramey v. Koons*, 230 F.2d 802, 806 (5th Cir. 1956) (rejecting

landlord's claim that assignment of the lease from the tenant to an entity with no assets was fraudulent because "the parties agreed that the tenant would assign the lease and upon the assumption of its obligations by the assignee the tenant would be released.").

No Maryland or Fourth Circuit decision has ever found a fraudulent conveyance based on the assignment of a lease or other contract where the assignor had an express contractual right to make the assignment and be released thereafter. Indeed, such a result would be contrary to Maryland contract law, as well as the public policy ensuring freedom of contract and the public policy disfavoring restraints on alienation of interests in real property recognized in *Julian*, 320 Md. 1.

**B.     IWA's Assignment of the Lease to RSD is not a conveyance within the ambit of Maryland's fraudulent conveyance statute**

Dismissal of Plaza's Fraudulent Conveyance claim pursuant to Defendants' motions for summary judgment and directed verdict was warranted for a second independent reason. The Maryland Uniform Fraudulent Conveyance Act (MUFCA) has never been applied in this context and is not applicable here. There is an abundance of case law applying MUFCA where debtors convey assets for little or no consideration to put such assets beyond the reach of creditors, typically leaving the debtor insolvent or unable to satisfy its debt. This Court addressed MUFCA's

reach in *In re Abatement Env't Res., Inc.*, 102 F. App'x 272, 275 (4th Cir. 2004).[4] Consistent with these Maryland cases, the *Abatement* decision noted the common law origins of fraudulent conveyance law, holding that the "purpose of the fraudulent conveyance doctrine is to prevent assets from being transferred away from a debtor in exchange for less than fair value, leaving a lack of funds to compensate the creditors." *Id.* at 276. The doctrine "prevents debtors from placing property beyond reach of their creditors when those assets should legitimately be made available to satisfy creditor demands. Consequently, if a debtor disposes of property, whether it be real or personal property, or goods or titles, with the intent to delay or defraud his or her creditors, the disposition may be set aside." Karen L. Schultz and Janice Holben, *Fraudulent conveyance or transfer of assets; definitions and nature of action*, 37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 1 (alterations omitted).

This is not such a case and MUFCA has no applicability here. As an initial matter, the only asset IWA conveyed via the Assignment was the Leasehold Estate, and the Assignment did not place the Leasehold Estate beyond Plaza's reach. Far from it. Before and after the Assignment, Plaza had the same contractual right to

---

[4] *Abatement* is unpublished and pre-dates the 2007 change in rules. Under Local Rule 32.1, this decision has precedential value in relation to a material issue in this case, namely, the reach of MUFCA. No published opinion of this Court serves as well.

receive the benefits of the Ground Lease, and the same contractual and common law rights of recourse for a breach by the tenant. Upon the occurrence of a default by RSD (or any future assignee), Plaza can exercise the full range of its contractual remedies, including retaking the premises with the $30 million office building erected by its tenant (ECF13-2 at 41-44) and/or pursuing contract damages against its defaulting tenant.

Plaza's Fraudulent Conveyance Claim is an attempted end-run around the release provisions in the Contracts. MUFCA's purpose is not to protect sophisticated parties from the foreseeable outcome of their bargained-for contracts. Because Plaza's claim to invalidate the Assignment "does not conform to the origins or purposes of fraudulent conveyance doctrine," it should be rejected as a matter of law. *Abatement*, 102 F. App'x at 275. The district court erred when it denied Defendants' motions for summary judgment and directed verdict on this ground. The Court should reverse that decision and enter judgment in favor of Defendants on Plaza's Fraudulent Conveyance claim.

## III.    THERE IS NO ALTER EGO CLAIM AS A MATTER OF LAW.

Plaza's Alter Ego claim was predicated on the allegation that IWA used RSD "merely as a shield to defraud the landlord and for the perpetration of the fraudulent conveyance." (ECF196 at 12 & 63). Plaza further contended that RSD was not a bona fide entity but simply a shell formed by IWA to hinder, delay, or defraud Plaza

with respect to Plaza's right to receive rent. (ECF196 at 12.) To prevail on its Alter Ego claim, Plaza had to prove that RSD was utilized to perpetrate fraud. In substance, Plaza's Alter Ego claim was duplicative of, and virtually indistinguishable from, its Fraudulent Conveyance claim.

Plaza's Alter Ego claim is legally deficient in the same way that its Fraudulent Conveyance claim fails. Because the Assignment was contractually permitted, it cannot be considered fraudulent as to Plaza, which negates the premise for piercing the corporate veil and imputing RSD's Ground Lease obligations to IWA.

Although pled as a separate cause of action, alter ego is merely one of several theories for piercing the corporate veil. See *Hildreth v. Tidewater Equip. Co.*, 378 Md. 724, 734-35 (2003). Maryland is far more restrictive on veil piercing than other states, *Ramlall v. MobilePro Corp.*, 202 Md. App. 20, 32 (2011), and accomplishing a veil piercing in Maryland is "a herculean task," *Dixon v. Process Corp.*, 38 Md. App. 644, 645 (1978). "The fiction of the wholly separate corporate form is jealously guarded by courts in Maryland, where, as a matter of public policy, the '[p]ower to pierce the corporate veil is to be exercised "reluctantly" and "cautiously."'" *Baltimore Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 552 (D. Md. 2011) (citation omitted). In Maryland, courts may disregard a corporate entity only where it is necessary to prevent fraud or enforce a paramount equity. *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 310-11 (1975); *Baltimore Line*, 771 F. Supp. 2d

at 532 ("[T]he rule of law in this State is that no matter how flimsily woven is the corporate curtain, it may not be flung aside except to prevent fraud or endorse [enforce] a paramount equity."); *Qun Lin v. Cruz,* 247 Md. App. 606, 641 (2020) ("Maryland courts have resisted piercing the corporate veil for reasons other than fraud").

Maryland law is settled that in the absence of fraud, "even if a sham corporation was set-up for the sole purpose of evading legal obligations, a court should not use its equitable powers to pierce the corporate veil." *Iceland Telecom, Ltd. v. Information Sys. & Networks*, 268 F. Supp. 2d 585, 91 (D. Md. 2003) (citing *Bart*, 275 Md. at 309) (refusing to pierce corporate veil where subsidiary was mere instrumentality of parent, observed no corporate formalities, and where subsidiary ceased to exist, thus evading its contractual obligations, because there was no evidence of fraud); *Bart*, 275 Md. at 309 (reversing order piercing corporate veil where there was no common law fraud); *Starfish Condo. Ass'n v. Yorkridge Serv. Corp.*, 295 Md. 693, 714, 719 (1983); *Baltimore*, 771 F. Supp. 2d at 552-55 (declining to pierce corporate veil on alter ego theory and noting that "evasion of a legal or contractual obligation is not tantamount to fraud" and "Maryland courts would be highly unlikely to find a paramount inequity in one business's inability to recover damages in a contractual dispute with another"). Maryland courts generally will not pierce the corporate veil between a parent and subsidiary corporation if the

subsidiary has some independent reason for its existence, such as holding title to a property. *Kreisler v. Goldberg*, 478 F.3d 209, 213 (2007) (citing *Turner v. Turner*, 147 Md. App. 350 (2002)).

Taking together the extraordinary reluctance of Maryland courts to pierce the corporate veil, and the absence of fraud as a matter of law, Defendants are entitled to judgment as a matter of law on Plaza's Alter Ego claim. The district court erred in denying Defendants' motions for summary judgment and for directed verdict on this claim.

## IV.    EVEN IF PLAZA'S FRAUDULENT CONVEYANCE AND ALTER EGO CLAIMS WERE NOT SUBJECT TO DISMISSAL AS A MATTER OF LAW, THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY EXCLUDING DEFENDANTS' RELEVANT AND ADMISSIBLE EVIDENCE CONTRADICTING PLAZA'S ALLEGATIONS OF DEFENDANT'S FRAUDULENT INTENT AND EXPLAINING THE CONTEXT OF THE CONTRACTS.

The district court erred when it excluded substantial portions of Defendants' evidence, including all its relevant expert evidence, to rebut Plaza's allegations that the Assignment had a fraudulent purpose. The exclusion of this evidence materially prejudiced Defendants and unfairly tilted the playing field in favor of Plaza.

The Court reviews the exclusion of evidence, including expert opinions, for an abuse of discretion. *Robinson v. Equifax Info. Servs., Inc.*, 560 F.3d 235, 240 n.1 (4th Cir. 2009); *Le Doux v. W. Express, Inc.*, 126 F.4th 978, 983 (4th Cir. 2025). The error must not be harmless; to affirm the verdict, the Court must find "that the

judgment was not substantially swayed by the error" and that Defendants' "substantial rights were not affected." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

The Court looks to whether the excluded evidence relates to a "material element[] of the cause of action" and also considers whether one party "had its hands tied" in responding to the other party's evidence. *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 834 (4th Cir. 1999) (vacating jury verdict); *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) ("exclusion of this evidence was not harmless error since [Defendants were] prevented from fully developing evidence relevant to a material issue"). Application of these standards warrants reversal of the verdict here.

Whether Defendants had fraudulent intent at the time of the Assignment in 2017 was plainly material to Plaza's fraudulent conveyance claim. (ECF610 at 158:10-159:7.) Plaza argued IWA deliberately formed RSD to be a "sham" or "shell" entity to improperly "stiff the landlord" out of future ground rent. (ECF610 at 28:18-25, 61:2-9, 66:12-19.) This was a ceaseless refrain; Plaza called RSD a "sham" or "shell" entity *45 times* in its opening and closing arguments alone. (ECF550 67:21, 68:1,5, 72:23, 73:4, 74:2, 76:11,12,21, 77:17, 79:6,21, 82:10,15, 86:10,16,21, 88:10, 89:15, 91:1; ECF610 59:22, 69:8 77:24, 84:21, 87:10, 158:9, 54:4,6, 55:1, 61:13,18,20,24, 62:15, 65:3,25, 69:22, 70:21, 75:5, 81:11,15, 87:3, 154:5,7, 155:7.) Plaza's representative called RSD a "scam." (ECF551 at 150:24-

151:7.) Specifically, Plaza argued that fraud was indicated because (a) IWA created RSD as an SPE to take the Assignment; (b) RSD did not own any assets other than the Ground Lease; (c) RSD was created a few days before the Assignment; (d) RSD was not funded to fulfill its obligations as tenant for the whole Ground Lease term. (ECF550 at 67:22-68:3, 68:3-7: ECF610 at 62:11-25, 69:4-10.)

The district court erroneously and unfairly excluded a range of evidence Defendants offered to rebut Plaza's allegations of fraud, and disallowed testimony from Defendants' two highly qualified and unrebutted expert witnesses. (ECF551 at 109-116) Douglas Bregman[5] is a nationally-recognized real estate lawyer in Maryland with over 40 years of experience with ground leases and other real property transactions. (ECF132-6 at 1.) Ian Ratner is an accountant with over 30 years of experience, including substantial experience related to real estate transactions. (ECF411:11 at 4-6.)

The court excluded Defendants' expert witnesses' testimony that Plaza's evidence to show a "sham" or "shell" entity were typical characteristics of other single-asset SPEs commonly utilized in the real estate industry, and that RSD was

---

[5] The district court at one point said Bregman could testify only about the basics of how a ground lease worked (ECF531 at 116:1-120:19) but no other opinions discussed here. Because the jury had already heard this testimony from Camalier, Defendants opted not to offer duplicative testimony since Bregman could offer no other expert opinions.

capitalized at a level consistent with normal business practice. (ECF551 at 109-113)
For example, the court excluded:

- Ratner's opinion as to the meaning of capitalization, his opinion that RSD was "adequately capitalized at the time of the Assignment and remains adequately capitalized today," and his opinion that the level of IWA's funding of RSD was "both reasonable and supported by industry practice." (ECF411 at 27-28.)

- Ratner's opinion that "it is not the industry standard for a ground tenant (or any commercial tenant) to have assets on hand at any given time to pay for the entire term of a long-term lease (for example 10 years or longer)." (ECF411 at 28) (in Ratner's experience, "it would be extraordinary to assume that IWA should have been required to fund over $372 million of Ground Lease payments in advance at the time of the Assignment.").

- Ratner and Bregman's opinions that SPEs like RSD are standard in the real estate industry; that SPEs typically hold only one asset for business reasons; and that SPEs are often formed close in time to the transaction. (ECF132-6 at 11-12, ECF411-11 at 21.)

The district court improperly excluded Defendants' experts not because they *lacked* relevant expertise, but for precisely the opposite reason: they would have

been too persuasive to the jury. The court also abdicated its "gatekeeper" role when it based its exclusion of the opinions partially on the court's personal view about the opinions' accuracy. In excluding Douglas Bregman's testimony, the district court stated:

> [Y]ou're going to say … in these ground lease situations, that when there are assignments, you don't have to say anything to the obligee about what you're doing. And I'm not going to allow that. It's an industry – that that's what usually happens. I'm just not going to allow it. It's the issue in this case. … And I don't want – *because Bregman would be a potent witness* – to come in and say, "You know, that what happens all the time." *First, I don't believe that.* But even if it were so, it still would be a factual issue, in my view, in this case as to what reasonably the language in the agreement means." (ECF531 at 120:20, 121:14.)

*See also* (ECF531 at 88, 94) (excluding Ratner's opinion about RSD's appropriate capitalization level by *sua sponte* declaring "[t]hat's not capitalization" and complaining that Ratner "is in the suit of armor and looks like a special expert").

There was no sound basis to exclude the expert testimony under FRE 702. It was, by the court's own admission, "potent" and persuasive evidence. Bregman and Ratner had "specialized knowledge" that was not "in the possession of the jurors." *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000). It was also relevant to matters central in the case. Defendants' experts were unquestionably qualified to provide such testimony. The court improperly excluded their testimony primarily on relevance grounds, erroneously asserting that some of the testimony was "misleading" or would be "unfairly prejudicial" to Plaza.

(ECF551 at 109-16). Plaza chose not to offer any experts to counter Defendants' experts so there was no showing that their opinions were misleading.

Defendants also sought to counter Plaza's imputation of fraud based upon RSD's ownership structure and level of funding by offering evidence that Plaza's owners, the Camalier family, own or manage similar SPEs to operate their vast Maryland real estate holdings, including the leasehold at issue here. Original Tenant was a Camalier-owned SPE that held a single asset—the Ground Lease. (ECF 127-18 at 3.) Original Tenant was formed very close in time to the Ground Lease transaction. (ECF127-18 at 3; ECF411-3.) The district court excluded all this evidence. (ECF531 at 131-32; ECF553 at 4-6), thus preventing Defendants from challenging Plaza's witness's testimony that RSD was a "scam" (ECF553 at 150-51), by pointing out that he personally managed an entity with the same characteristics he cited in ascribing fraud to RSD.

Further, the district court's rulings barred Defendants from cross-examining Camalier, Plaza's corporate representative, to challenge Plaza's argument that walking away from a financial obligation in a way that "stiffs" the counterparty out of contract is fraudulent. By excluding this history, the district court excluded Defendants' exhibits of that history, including the default of the Loan by the Camalier family entity and the resulting foreclosure by IWA that gave rise to the Assignment. (ECF553 at 4-6; ECF551 at 130-31, ECF551 at 137-40)

By excluding the history of the Ground Lease, Loan, and Estoppel Agreement, the district court prevented Defendants from showing the jury that Camalier himself had "stiffed" IWA out of $27 million when he caused Original Tenant to walk away from the Loan in 2011. (ECF 127-18 at 1-3, ECF132-14, ECF 410-14). The court also prevented Defendants from showing the jury that Camalier himself had "stiffed" Plaza out of hundreds of millions of dollars in rent when he caused Original Tenant to walk away from the Ground Lease in 2011. (ECF410.)

The Camalier family controlled its own destiny in 2011. The Camalier family could have fully funded the Original Tenant to pay back the Loan but chose not to. As owner of Plaza, the Camalier family could have reduced or foregone ground rent and avoided Original Tenant's default of the Ground Lease. Instead, the Camalier family took steps to manufacture its own default of the Ground Lease and Loan, triggering the events here. And yet the district court prevented Defendants from explaining this circumstance to the jury. Camalier testified that he had clean hands when, in fact, he assuredly did not.

Defendants had another compelling argument for why they lacked intent to defraud Plaza: they were acting within their rights under the Contracts. By failing to properly instruct the jury that the contracts permitted IWA's Assignment, as it should have done, the court materially altered the mix of information available to the jury in its evaluation of Plaza's assertions of fraud – to the considerable detriment

of Defendants and to the benefit of Plaza. This was error that warrants reversal of the jury's verdict.

Instead, the district court instructed the jury to determine the meaning of the Contracts (ECF610 at 36:3-15.) To do so, instructed the district court, the jury had to evaluate the contract language "in context," meaning an evaluation of "not only the text of the entire contract, but also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution of the contract." *Id.*

But while the court instructed the jury to consider the Contracts' context, the district court did so only after it had categorically excluded Defendants' evidence of the context, character and purpose of the Contracts. (ECF531 at 131-32; ECF553 at 4-6) For example, it excluded Bregman and Ratner's opinions that ground landlords like Plaza have strong economic incentives to agree to broad assignment provisions. And it excluded Bregman's opinion that it is industry practice for a lender in a ground lease context to demand that a landlord agree to broad assignment rights. (ECF132-6 at 8.) This expert testimony would have helped the jury understand the complex and unfamiliar world of ground lease economics and explain why Plaza would have agreed to free assignability even though this created financial risks down the road.

In sum, the exclusion of this evidence affected Defendants' substantial rights because it "prevented the jury from gaining a full understanding of the nature of the

50

transaction." *Bank of Montreal*, 193 F.3d at 834. Defendants were "prevented from fully developing evidence relevant to a material issue" in the case. *Schultz*, 24 F.3d at 632. Rather than hearing both sides of the case, the jury heard only Plaza's. These evidentiary errors require reversal of the verdict.

## V.    THE DISTRICT COURT ERRED IN MULTIPLE JURY INSTRUCTIONS.

The district court gave legally erroneous instructions to the jury on the issues of Adequate Assurance of Performance, Good Faith and Fair Dealing, and Alter Ego. These errors require reversal of the jury's verdict. During a marathon 13-hour, 3-day charge conference (ECF607-609), Defendants registered specific objections to the errors in each instruction. The record reflects that the court struggled to find the correct statement of legal principles to instruct the jury given the lack of Maryland precedent for nullifying an express right of assignment in a real property lease. However, despite much effort, at the end of the day, the court's jury instructions were legally flawed.

This Court reviews "the decision to give or not give a jury instruction, and the content of an instruction, for abuse of discretion." *Snoeyenbos v. Curtis*, 60 F.4th 723, 729 (4th Cir. 2023). It "review[s] *de novo* whether the district court's instructions to the jury were correct statements of the law." *Id*. "Even if a jury was erroneously instructed, however, we will not set aside a resulting verdict unless the erroneous instruction *seriously* prejudiced the challenging party's case." *Gentry v.*

*E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 233 (4th Cir. 2016) (quoting

*Bunn v. Oldendorff Carriers GmbH & Co. KG*, 723 F.3d 454, 468 (4th Cir. 2013)

(internal quotation omitted).

Each error described below warrants reversal under the standards discussed

above.

*Adequate Assurance of Performance*. Shortly after the Assignment, Plaza

sought information for the purpose of determining RSD's ability to perform the

tenant's Ground Lease obligations. As discussed above, the court erroneously ruled

that Plaza was entitled to such information *as a matter of law* in its 2022 ruling on

Plaza's motion for partial summary judgment. *See* Section I.A.3 above. When

announcing his decision to deny summary judgment in 2024, however, the court was

plainly confused about the doctrine's applicability at trial, saying one minute that

"I'm not sure what the argument of adequate assurances is anymore. Adequate

assurances, the Court held, should be given, whether they were fully adequately

given in timely fashion obviously remains to be seen," (ECF467 at 144:17-20.) and

then, in nearly the next breath, saying "[a]dequate assurances I don't think are

disputed anymore. They have been given insofar as the Court has not permitted any

further discovery on the matter." (ECF467 at 145:16-18.) If, as the district court

held, adequate assurances "have been given," then there was no need to submit it to

the jury at all. But as reflected in the jury instructions, the district court did so.

In any event, as noted in Defendants' objection at trial, (ECF607 177-84) the doctrine of adequate assurance has no applicability to a ground lease. Maryland codified the adequate assurance doctrine in its UCC, Md. Code Ann., Com. Law § 2-210, but the Maryland UCC applies only to the sale of goods and not to commercial leases, *id*. § 2-102. No Maryland court has ever applied the doctrine in the context of a property lease.

The adequate assurance instruction is legally erroneous for a second, independent reason, even if it could theoretically apply to a real estate lease. That is because the adequate assurance mechanism has *no applicability to IWA's Assignment*. Conceivably, if it applied at all, it would apply to RSD's ability to perform under the Ground Lease, not IWA's performance of any duty it owed under the Ground Lease. And the only effect of RSD's failure to provide assurance would be to afford Plaza a contract remedy against RSD for repudiation of the Ground Lease. Plaza cannot invalidate the Assignment, or seek a remedy against IWA, for RSD's supposed failure to provide assurances of its ability to perform. But Plaza never asserted a claim against RSD for this theoretical contract remedy, so the doctrine had no relevance whatsoever at trial.

The court's adequate assurance of performance instruction also fatally infected the court's instruction on the implied duty of good faith and fair dealing, which expressly referred to Plaza's post-Assignment information requests, and

expressly incorporated the adequate assurance instruction, erroneously authorizing the jury to find the information requests constituted as a basis for the jury to find IWA breached its implied duty. (ECF610 at 26, 36-37.) The district court's instructions to the jury were thus fundamentally flawed, undermining the entirety of the jury's verdict.

*Alter Ego Doctrine*. The district court instructed the jury to evaluate Plaza's alter ego claim under a preponderance of an evidence standard. (ECF610 at 40) This is an incorrect statement of the law as the clear and convincing standard applies. *See, e.g.*, *Dixon v. The Process Corp.*, 38 Md. App. 644, 653-56 (1978). The Defendants preserved their objection to this instruction. (ECF607 at 84-98.)

## <u>CONCLUSION</u>

The Court should reverse the verdict and Final Judgment of the district court and enter judgment in favor of Defendants or, alternatively, vacate the verdict and Final Judgment and remand for a new trial.

Dated:  September 12, 2025                    Respectfully submitted,

/s/Rebecca A. Davis                          /s/Sara E. Kropf
Rebecca A. Davis                             Sara E. Kropf
Kevin B. Getzendanner                        Kropf Moseley Schmitt PLLC
Arnall Golden & Gregory LLP                  1100 H Street NW, Suite 1220
171 17th Street NW, Suite 2100               Washington, DC 20005
Atlanta, GA 30363                            202-627-6900
(404) 873-8500                               sara@kmlawfirm.com
rebecca.davis@agg.com
kevin.getzendanner@agg.com

*Counsel for Appellant*                      *Counsel for Appellant*
*Investors Warranty of America, LLC*         *Rock Springs Drive LLC*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Rule 32-1, the foregoing opening brief is in 14-point, proportionately spaced Times New Roman type and contains 12,869 words.

Dated:          September 12, 2025                    /s/Rebecca A. Davis
                                                      Rebecca A. Davis

## <u>STATEMENT OF ORAL ARGUMENT</u>

Appellants Investors Warranty of America, LLC and Rock Springs Drive

LLC respectfully request oral argument.

57

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Opening Brief of Appellants with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:      September 12, 2025              /s/Rebecca A. Davis
                                            Rebecca A. Davis